1   Sean Reis (SBN 184044)
    EDELSON MCGUIRE LLP
2   30021 Tomas Street, Suite 300
    Rancho Santa Margarita, CA 92688
3   949-459-2124 (phone)
    949-459-2123 (fax)
4   sreis@edelson.com

5   *Counsel for Plaintiffs*
    (additional counsel appear on the signature page)

6

7                    **UNITED STATES DISTRICT COURT**
            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

8   MARIKA HAMILTON, MICHAEL              Case No. C 09-4152 CW
    HICKMAN, JEFFREY and ELLEN YELLIN,
9   and BRENDAN O'LEARY, individually and
    on behalf of a class of similarly situated
10  individuals,                          **CONSOLIDATED AMENDED CLASS
                                          ACTION COMPLAINT AND JURY
11                    Plaintiffs,         DEMAND**

12  v.

13  WELLS FARGO BANK, N.A., for itself and   Hon. Claudia Wilken
    as a successor in interest to GOLDEN WEST
14  BANK, WACHOVIA BANK, and WELLS
    FARGO FINANCIAL / NOWLINE BANK,
15
                      Defendant.
16

17        Marika Hamilton, Michael Hickman, Jeffrey and Ellen Yellin, and Brendan O'Leary

18  ("Plaintiffs"), for their Consolidated Amended Class Action Complaint, allege as follows upon

19  information and belief, based upon, inter alia, investigation conducted by their attorneys, except as

20  to those allegations pertaining to Plaintiffs and their counsel personally, which are alleged upon

21  personal knowledge:

22                              **Introduction**

23        1.      This case is about Wells Fargo Bank, N.A.'s and its acquired banks Golden West,

24  Wachovia, and Wells Fargo Financial / NowLine's (collectively "Defendant" or "Wells Fargo")

25  use of false pretenses and unlawful "triggering events" to improperly suspend accounts and reduce

26  credit limits on home equity lines of credit ("HELOCs") across the country.  In an attempt to

27  transfer its customers away from low-interest HELOCs and into higher interest alternatives, and in

28

part to limit its exposure to the risk of collapse in the United States housing market, Wells Fargo has violated the Truth-in-Lending Act ("TILA") and its implementing regulation, Regulation Z, and has broken its contractual obligations and promises with its HELOC account holders (collectively the "Settlement Class members") – the intended result of which has been to deny Settlement Class members their bargained-for access to hundreds of millions of dollars worth of affordable credit at a critical time.

2.      Each member of the Settlement Class had a HELOC that Wells Fargo reduced or suspended in a manner that was illegal, unfair, oppressive and deceptive.  As a result of Defendant's wrongful actions, Plaintiffs bring this class action on behalf of themselves and the putative Settlement Class for statutory damages, injunctive relief, declaratory judgment, actual damages and attorneys' fees for Defendant's violations of Regulation Z of TILA, 15 U.S.C. § 1640(a); 12 C.F.R. § 226.5(b), breach of contract, breach of the implied covenants of good faith and fair dealing, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/2 et. seq., violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 1700, and unjust enrichment.

**Nature of the Case**

3.      As early as fall of 2008, Defendant began sending form letters to thousands of its HELOC customers, including Plaintiffs, advising them that their HELOCs had been either suspended or reduced.[1]  (*See, e.g.*, Plaintiffs' suspension letters, true and correct copies of which are attached hereto as Group Exhibit A.)

4.      The letters stated one of two purported reasons for the adverse action: 1) Wells Fargo reasonably believed the customers will not be able to meet their future repayment obligations due to a material change in the customers' financial circumstances, or 2) the suspension is warranted due to a significant decline in the customers' home value.  (*Id.*)

5.      In reality, these purported reasons were based upon false premises that did not justify the adverse action taken by Wells Fargo against Plaintiffs and the Settlement Class

---

[1] Terms "suspended," "reduced," "treated," or "restricted" are used interchangeably and mean the adverse action by Wells Fargo against the Settlement Class members' HELOCs.

1  members.

2  6.      With regard to the first "reason" – change in financial circumstances – Defendant

3  acted intentionally and knowingly to falsely claim that its customers' financial circumstances had

4  changed.  Defendant relied on "derogatory credit" and other insufficient or immaterial factors to

5  falsely trigger its ability under federal law to suspend or reduce HELOCs.  As a result, in violation

6  of federal law, Defendant restricted HELOCs of many homeowners, such as Plaintiff Hamilton,

7  whose financial circumstances had not in fact materially changed.

8  7.      Wells Fargo did not have a reasonable basis for claiming that customers' financial

9  circumstances had materially changed.  For example, a single derogatory item on a credit report,

10  without more, does not constitute a material adverse change in financial circumstances.  Even if a

11  single derogatory item could signal a material change, Wells Fargo failed to reasonably investigate

12  the validity of or basis for the derogatory item and  verify whether the item was legitimate and

13  whether an adverse change in financial circumstances had in fact occurred.

14  8.      With regard to the second "reason" – decline in home value – Defendant

15  intentionally and knowingly failed to perform an appropriate individualized assessment of its

16  customers' home values.  Rather, on information and belief, Defendant used dubious automated

17  formulas, commonly known as Automated Valuation Models ("AVMs"), which implemented

18  unreliable or inaccurate analyses designed to reach a predetermined false home value.  As a result,

19  in violation of federal law, Defendant restricted the HELOCs of many homeowners, including

20  Plaintiffs Hickman, the Yellins, and O'Leary, whose home values had not in fact significantly

21  declined.

22  9.      Wells Fargo did not have a reasonable basis for restricting HELOCs due to

23  reductions in property values.  While federal law permits Defendant to reduce a credit limit if the

24  individual property securing the HELOC loses a significant amount of its value, federal law

25  prohibits a lender from reducing the credit limit without first assessing the value of the individual

26  property or otherwise having a sound basis for suspending or reducing the credit limit.

27  10.     Making matters worse, when Settlement Class members contacted Wells Fargo to

28

1  dispute the adverse action, customer service representatives did not reasonably respond to attempts

2  by the Class members to demonstrate that either their financial circumstances had not materially

3  changed or their home values had not significantly declined.  Instead, Wells Fargo representatives

4  threatened Class members, provided false or conflicting information, or otherwise actively

5  discouraged Class members from challenging Wells Fargo's actions.

6       11.    As a result, Defendant's intentional and systematic suspensions of its customers'

7  HELOCs, and implementation of standards that are inconsistent with Regulation Z and TILA,

8  were and remain unlawful, unfair, and deceptive.

9  **Parties**

10       12.    **Plaintiff Marika Hamilton:**  Plaintiff Hamilton maintains her primary residence in

11  Fort Wayne, Indiana.  In or around August 2008, Hamilton obtained a HELOC from Wells Fargo

12  in the amount of $103,600 secured by her home in Fort Wayne.  Hamilton obtained the HELOC

13  for personal purposes, such as home renovations, and not for business purposes.  On or about

14  February 26, 2009, Wells Fargo sent Hamilton a letter indicating that Wells Fargo had restricted

15  all new advances on Hamilton's HELOC due to a material adverse change in financial

16  circumstances based on purported derogatory credit.

17       13.    **Plaintiff Michael Hickman:**  Plaintiff Hickman is a resident of Westmont, Illinois.

18  In or around May 2006, Hickman obtained a HELOC from Defendant in the amount of $75,000

19  secured by his personal residence.  He obtained the HELOC for personal, household and family

20  purposes.  On or about October 14, 2008, Wells Fargo sent Hickman a letter indicating that Wells

21  Fargo had reduced total the funds available on his HELOC to approximately $31,000 – his then

22  outstanding balance – due to a decline in his home value.

23       14.    **Plaintiffs Jeffrey and Ellen Yellin:**  The Yellins reside in Oak Park, California.

24  In or around January 2007, the Yellins obtained a HELOC from Wells Fargo in the amount of

25  $200,000, secured by their personal residence.  They obtained the HELOC for personal,

26  household, and family purposes, such as financing substantial renovations of their home.  In or

27  around October 2008, Wells Fargo sent the Yellins a letter indicating that Wells Fargo had

28

1   reduced their HELOC credit limit to $111,448.08 – just above their then outstanding balance – due
2   to a decline in the value of their home.

3        15.   **Plaintiff Brendan O'Leary:**  Plaintiff O'Leary resides in Sacramento, California.
4   In or around December 2005, O'Leary obtained a HELOC from Wells Fargo in the amount of
5   $120,000, secured by his personal residence.  O'Leary's HELOC was for personal, family and
6   household purposes.  In or around March 2009, O'Leary received a letter indicating that his
7   HELOC had been reduced due to a significant decline in his home value.

8        16.   **Defendant Wells Fargo:**  Wells Fargo Bank, N.A. is a national banking
9   association, chartered in Sioux Falls, South Dakota, with its principal place of business at 420
10  Montgomery Street, San Francisco, California 94163.  Wells Fargo is one of the country's largest
11  banks and has offices throughout the country.  Wells Fargo acquired Wachovia Bank in or around
12  December 2008, and Wachovia Bank operates as a division of Wells Fargo.  Golden West
13  Financial was acquired by Wachovia Bank in or around 2006.

14                              **Jurisdiction and Venue**

15       17.   This Court has subject matter jurisdiction over this case under 28 U.S.C. §
16  1332(d)(2).  This Consolidated Amended Class Action Complaint ("Complaint") alleges claims on
17  behalf of three national classes of homeowners who are minimally diverse from Defendant.  On
18  information and belief, the aggregate of these claims exceeds the sum or value of $5,000,000.
19  This Court further has federal question subject matter jurisdiction under 28 U.S.C. § 1331 as this
20  action arises in part under Regulation Z of the Truth-in-Lending Act, 15 U.S.C. § 1647, 12 C.F.R.
21  § 226.5b.  This Court has supplemental subject matter jurisdiction over the pendent state law
22  claims under 28 U.S.C. § 1367.

23       18.   Defendant Wells Fargo is a national banking association chartered in South Dakota
24  with its principal place of business in California, and is considered a citizen of South Dakota for
25  the purposes of diversity jurisdiction under 28 U.S.C. § 1348.

26       19.   Venue is also proper before this Court under 28 U.S.C. § 1391(b)(2) as a
27  substantial part of the events, circumstances, and omissions giving rise to these claims occurred in

28

1  this District.

2      20.    This Court has personal jurisdiction over Defendant under Cal. Code Civ. Proc. §

3  410.10 because some of the acts alleged herein were committed in California (specifically in the

4  Northern District of California), and because Defendant is registered to do business in this state

5  and actively conducts business in this District.

6              **Allegations as to Plaintiffs' Individual Claims**

7  *Marika Hamilton*

8      21.    In or around August 2008, Hamilton obtained a HELOC in the amount of $103,600

9  secured by her primary residence.  (*See* Plaintiffs' HELOC Agreements, true and accurate copies

10  of which are attached hereto as Group Exhibit B.)  Hamilton obtained the HELOC for personal

11  and household purposes, such as home improvements and renovations, including home bathroom

12  remodeling and home carpet replacement.

13      22.    On or about February 26, 2009, Wells Fargo mailed Hamilton a notice that future

14  draws on her HELOC had been restricted due to "derogatory credit."  (*See* Grp. Ex. A.)

15      23.    Hamilton's derogatory credit item was a late charge of approximately $25 that she

16  disputed owing.  Hamilton eventually settled the dispute over the late charge and, on

17  information and belief, the derogatory item has since been removed from her credit report.

18      24.    Hamilton's credit history was otherwise strong.  Likewise, her financial

19  circumstances as a small business owner had not materially or adversely changed since she first

20  obtained her HELOC.

21      25.    Hamilton complied with all other terms of her HELOC agreement, making all

22  required payments in a timely manner.

23      26.    Hamilton attempted to request reinstatement as provided for in the February 26,

24  2009 suspension letter by calling the telephone number stated in the letter.  Wells Fargo

25  representatives told Hamilton that the harder she pressed for reinstatement, the more difficult and

26  painful Wells Fargo would make the reinstatement process.  When Hamilton asked where she

27  should put her money if her Wells Fargo HELOC was not safe, Wells Fargo customer service

28

1  responded that she "should carry cash."

2      27.    Wells Fargo went so far as to send representatives to visit Hamilton at her place of

3  business, a restaurant franchise that she owns and operates.  The representatives made explicit

4  threats to Hamilton that they would conduct a thorough examination of all of Hamilton's accounts,

5  including her business accounts and credit lines that she depended on for the operation of her

6  business, if Hamilton protested Wells Fargo's decision as to her HELOC, challenged Wells Fargo,

7  or otherwise sought or attempted to exercise any of her rights under the HELOC agreement.

8  Wells Fargo representatives warned that Hamilton would risk substantial additional loss of credit

9  and damage to her business if she attempted to exercise her rights under the HELOC Agreement.

10      28.    At no time did Hamilton's income materially change or decrease, and at no time

11  did Defendant have a reasonable basis for concluding that Hamilton would not be able to satisfy

12  the terms of her loan agreement.  Accordingly, Wells Fargo improperly suspended or reduced

13  Hamilton's HELOC, and when she sought reinstatement, Wells Fargo threatened her with

14  financial ruin.

15      29.    After Wells Fargo representatives threatened Hamilton, she went to an attorney.

16  Defendant reinstated Hamilton's HELOC only after she filed her original lawsuit and there is

17  nothing to prevent Defendant, absent an Order from this Court, from attempting to wrongfully

18  suspend or reduce Hamilton's HELOC in the future.

19      30.    Hamilton's HELOC with Defendant was her primary line of personal credit.

20  Defendant's suspension of Hamilton's HELOC negatively impacted the amount of credit she had

21  available to pay for personal and household expenses.  In addition to depriving her of HELOC

22  availability, Defendant's acts increased Hamilton's Credit Utilization Rate ("CUR"), damaged

23  Hamilton's credit rating and increased the cost of credit to her.

24  ***Michael Hickman***

25      31.    Defendant and Hickman entered into a HELOC agreement in May 2006.  (*See* Grp.

26  Ex. B.)  Under the terms of the HELOC Agreement, Defendant provided Hickman access to a

27  $75,000 line of credit, secured by a mortgage on Hickman's primary residence, located in

28

Westmont, Illinois.  Hickman obtained the HELOC primarily for personal, family and/or household purposes.

32.     On or about October 14, 2008, Defendant mailed Hickman a letter indicating that Defendant had reduced Hickman's credit limit by more than $40,000, or by nearly 60%, to an amount just over his then-outstanding balance.  The letter stated that Defendant was lowering the credit limit "due to a substantial decline in the value of the property securing the Account."  (*See* Grp. Ex. A.)

33.     Hickman contacted Wells Fargo and requested additional information on the basis for Wells Fargo's decision.  On or about October 20, 2008, Wells Fargo responded that the decision was based on a "value" obtained from an AVM on May 1, 2008.  The purported "value" of the property  was $531,000.

34.     On January 26, 2009, approximately three months *after* Wells Fargo slashed his HELOC credit limit due to a purported decrease in the value of his home, Hickman received an unsolicited notice indicating that his Wells Fargo Visa credit card spending limit, carrying a significantly higher interest rate than his HELOC, had been *increased* 20% from $20,000 to $24,000.

35.     Hickman's HELOC with Defendant was his primary line of credit.  Defendant's reduction of the credit limit on Hickman's HELOC denied Hickman access to credit and dramatically increased the ratio of credit Hickman used to the amount of credit Hickman had available to him.  In turn, on information and belief, Defendant's acts drove up Hickman's CUR, damaged Hickman's credit rating and increased the cost of credit to him.

***Jeffrey and Ellen Yellin***

36.     In or around January 2007, Wells Fargo and the Yellins entered into a HELOC agreement whereby Wells Fargo provided the Yellins a $200,000 line of credit secured by a mortgage on their primary residence.  (*See* Grp. Ex. B.)  On information and belief, Wells Fargo valued the Yellins' primary residence at $750,000 when the Yellins' HELOC was originated.

37.     In or around October 2008, Defendant mailed the Yellins a letter indicating that the credit limit on the account had been lowered to $111,448.08, an amount just above the then-outstanding balance.  The letter stated that the reduction was "due to a substantial decline in the value of the property securing the Account."  (*See* Grp. Ex. A.)

38.     Following the notice, Mr. Yellin promptly contacted Wells Fargo customer service in person and over the phone seeking additional information on the reason for the reduction.

39.     During Mr. Yellin's repeated calls to Wells Fargo customer service and visits to his local Wells Fargo branch, various Wells Fargo customer service representatives informed Mr. Yellin that:

a.      Wells Fargo was unable or unwilling to disclose the present value of the Yellins' home, as determined by Wells Fargo's AVM.  Finally, one of the customer service representatives told Mr. Yellin that it was valued at $582,000.  The same representative informed Mr. Yellin, however, that the only way to get the HELOC reinstated was to submit their financial information and re-qualify for a new HELOC.

b.      Wells Fargo was unable and unwilling to disclose the original value from which the home had purportedly significantly declined and that, with respect to the original value, Wells Fargo only keeps such information for 90 days and generally does not keep such information in the customer's file.

c.      Wells Fargo had actually made its decision to reduce the Yellins' HELOC limit due to new underwriting and loan-to-value ("LTV") ratio standards, and that the Yellins' LTV was too high under the new LTV standard.  However, another customer service representative assured Mr. Yellin that the 80% LTV used to originate the HELOC was still the benchmark LTV and the Yellins' property has not fallen below that benchmark LTV.

d.      The October 2008 Notice of HELOC Reduction letter was not triggered by an appraisal of the Yellins' home; rather, an evaluation of the "Oak Park area" where the home is located had been performed by a "computer scoring system."

e.     Wells Fargo was willing and able to write a new HELOC with the original credit limit of $200,000, using the Yellins' home as security, if Plaintiffs would agree to pay a higher interest rate than the rate under the present HELOC.

f.     The same AVM value of $582,000 that supposedly triggered the reduction of Plaintiffs' HELOC would be sufficient to support a new HELOC in the amount of $215,000, but only if the Yellins would submit new financial statements and re-qualify for a new HELOC.

40.     In or around September 2009, the Yellins again contacted Wells Fargo in an attempt to reinstate their HELOC.  Wells Fargo told the Yellins that they would first need to submit personal financial statements and, if their financial information was found to be satisfactory at Wells Fargo's discretion, the Yellins would then need to order and pay for an appraisal of their home.  Despite Wells Fargo's prior inability to provide the value of the Yellins' home at the time of the HELOC origination, and Wells Fargo's statement that Wells Fargo generally only keeps such information for 90 days, in or around September 2009 a representative informed Mr. Yellin that the home was valued at $750,000 at the time of origination.

41.     Wells Fargo took the above actions despite the fact that Wells Fargo's HELOC Agreement and Regulation Z only permit credit reductions and account suspensions when the value of the property securing the HELOC has "significantly" declined, and the Yellins' property value had not significantly declined.  In fact, on information and belief, the fair market value of the home at the time of the HELOC reduction was at least $610,000, based on comparable sales in Oak Park, California during the relevant period of time.

42.     On information and belief, in addition to using an unreasonably manipulated AVM to undervalue the Yellins' home, Wells Fargo also failed to consider the home's original value or the balance remaining on Plaintiffs' first mortgage prior to making its decision to reduce Plaintiffs' HELOC.

43.     The initial unencumbered equity in Plaintiffs' home at the time of the HELOC origination was $336,000:

1        **$750,000 (original appraised value) - $214,000 (the first mortgage balance) –**

2        **- $200,000 (HELOC limit) = $336,000 equity cushion.**

3        44.     At the time Wells Fargo reduced Plaintiffs' HELOC, their first mortgage had been

4  paid down to $192,000.  As Plaintiffs' first mortgage lender, Wells Fargo knew or should have

5  known Plaintiffs' first mortgage balance at the time it reduced their HELOC.  Thus, even under

6  Wells Fargo's own AVM-generated undervaluation of Plaintiffs' property at $582,000, the

7  unencumbered equity was still $190,000:

8        **$582,000 (Wells Fargo's AVM valuation) - $192,0000 (first mortgage balance) –**

9        **- $200,000 (HELOC limit) = $190,000 equity cushion.**

10  This means that even under Wells Fargo's own, false, undervaluation, the unencumbered equity

11  had dropped by only 43.5 %.  And given the actual value of Plaintiffs' property of at least

12  $610,000, the actual unencumbered equity at the time of the HELOC reduction was $218,000:

13        **$610,000 (actual market value of the Subject Property) –**

14        **$192,000 (the first mortgage balance) - $200,000 (the HELOC limit) =**

15        **= $218,000 equity cushion.**

16  The decline in equity was thus only 35.2%.  Hence, under either calculation, the drop in

17  unencumbered equity was not a "significant decline" within the meaning of the Agreement that

18  would trigger Wells Fargo's ability to reduce Plaintiffs' HELOC credit limit.  At all times

19  relevant, Wells Fargo remained fully secured in the HELOC.

20        45.     Wells Fargo's reduction of the Yellins' HELOC denied them access to credit and

21  left them unable to finish their home remodeling.  Wells Fargo's conduct further dramatically

22  increased the ratio of credit they used to the amount of credit the Yellins had available to them.  In

23  turn, on information and belief, Wells Fargo's acts drove up the Yellins CUR, a major component

24  of their credit rating, thereby damaging Plaintiffs' credit rating and increasing the cost of credit to

25  them.

26  ***Brendan O'Leary***

27        46.     O'Leary purchased his home in Sacramento, California, in 2002 for $305,000.  In

28

or around December 2005, O'Leary entered into a HELOC Agreement with Wells Fargo for a $120,000 HELOC.  (*See* Grp. Ex. B.)  The balance of his first mortgage at that time was approximately $245,000.

47.    O'Leary planned to use the HELOC for personal, family, and household purposes, such as home-related expenses.

48.    In March 2009, O'Leary received a letter from Wells Fargo stating that his HELOC has been reduced to $68,500 due to a purported "substantial decline" in his home value.  (*See* Grp. Ex. A.)  The letter did not state what the new declined home value was, how Wells Fargo determined the new value, what the initial home value at the HELOC origination was, what value was needed for full reinstatement of the HELOC, or any other material information.

49.    On information and belief, Wells Fargo's decision to reduce O'Leary's HELOC was based solely on a geographic area survey covering home values in the area where O'Leary's home is located, and not on an actual assessment of O'Leary's home value.  Thus, Wells Fargo had no reasonable justification for reducing O'Leary's HELOC.

50.    Wells Fargo's reduction of O'Leary's credit limit denied him access to more than $51,000.  O'Leary agreed to pay an annual fee in return for access to a $120,000 HELOC and when Defendant reduced O'Leary's credit limit, it proportionally reduced and diminished the benefit of the bargain O'Leary expected to realize from that fee.  Further, if O'Leary wanted to refinance or pay off and close the reduced HELOC, he would be forced to pay an early termination fee.  Defendant's reduction of O'Leary's HELOC also increased O'Leary's CUR, increased the cost of credit to O'Leary, and damaged O'Leary's credit rating.

## Class Certification Allegations

51.    **Definition of the Class:** Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this Complaint against Defendant on behalf of three classes defined as follows:

1.    The "Financial Circumstances" Class:

All persons in the United States from January 1, 2008 to the present whose Wells Fargo HELOC accounts were restricted or reduced based on a claim by Wells Fargo that the borrower's

1  financial circumstances had experienced an adverse material change to justify treatment of the

2  borrower's account.

3           2.      The "Property Value" Class:

4      All persons in the United States from January 1, 2008 to the present whose Wells Fargo

5  HELOC accounts were restricted or reduced based on a claim by Wells Fargo that the property

6  securing the HELOC had experienced a significant decline in value to justify the treatment of the

7  borrower's account.

8           3.      The "Former Customer" Class:

9      All Persons in the United States from January 1, 2008 to the present who closed their

10  Wells Fargo HELOC accounts following a restriction or reduction of the account by Wells Fargo

11  based upon a claim by Wells Fargo that there has been a material adverse change in the borrower's

12  financial circumstances, or a significant decline in the value of the property securing the HELOC,

13  and who incurred a deferred origination fee as a result of the closure.

14      Plaintiffs seek certification of the Financial Circumstances Class and the Property Value

15  Class under Federal Rule of Civil Procedure 23(b)(2), and the Former Customer Class – under

16  Rule 23(b)(3).  Collectively, the members of all three classes are referred to as the "Settlement

17  Class" members.

18      Excluded from the Settlement Class are:  1) any Judge or Magistrate presiding over this

19  action and underlying class actions, as well as members of their families; 2) Defendant and any of

20  Defendant's parent companies, subsidiaries, or affiliates; 3) persons who properly execute and file

21  a timely request for exclusion from the Class; and 4) the immediate family members of any such

22  excluded person(s).

23      52.      **Numerosity:** The exact number of the members of the Settlement Class is

24  unknown to Plaintiffs, but it is clear that individual joinder is impracticable.  Defendant sent its

25  generic HELOC suspension letters to thousands of borrowers, and a substantial percentage of the

26  recipients of these letters fall into the definition of the Settlement Class.  Class members can be

27  easily identified through Defendant's records.

28

53.     **Commonality:** Common questions of fact and law exist as to all members of the Settlement Class and predominate over the questions affecting only individual members.  These common questions include:

(a) What were Defendant's criteria for suspending its borrowers' HELOCs;

(b) Whether Defendant's suspensions of its borrowers' HELOCs as alleged in this Complaint violated TILA and Regulation Z;

(c) Whether Defendant's suspensions of its borrowers' HELOCs as alleged in this Complaint breached Defendant's HELOC contracts with the Settlement Class members;

(d) Whether Defendant's conduct as alleged herein was in breach of the implied covenants of good faith and fair dealing;

(e) Whether Defendant's suspension of HELOCs based on derogatory credit and/or purported material changes in financial circumstances were made without a reasonable basis for concluding such material changes had in fact occurred;

(f) Whether Defendant had a reasonable ground for concluding the derogatory credit items present in its HELOC borrowers' credit reports constituted material adverse changes in the borrowers' financial circumstances;

(g) Whether in those cases where a material change in financial circumstances had in fact occurred, Defendant had a reasonable basis for concluding the material changes would render such customers unable to meet the terms of their HELOC agreements;

(h) What were Defendant's methods for valuing the subject properties securing the HELOCs;

(i) Whether Defendant suspended HELOCs of those borrowers whose home values had not experienced a significant decline;

(j) What were Defendant's policies and procedures for handling reinstatement requests; and

(k) Whether Plaintiffs and the Settlement Class members are entitled to relief, and the nature of such relief.

54.   **Typicality:** Plaintiffs' claims are typical of the claims of the Settlement Class members.  All named Plaintiffs' HELOCs were restricted based on either a purported adverse change in the financial circumstances (Plaintiff Hamilton) or the supposed significant decline in home values (Plaintiffs Hickman, the Yellins, and O'Leary).  Plaintiffs alleged that the adverse action taken against their HELOCs breached the Parties' HELOC contracts and violated TILA and Regulation Z because the suspensions occurred in the absence of an adverse change in Plaintiff Hamilton's financial circumstances and in the absence of a significant decline in the other named Plaintiffs' home values.  If proven successful on the merits, these claims will produce identical relief to all Settlement Class members, such as statutory damages under TILA, damages for breach of contract, damages for violation of the ICFA, and injunctive relief and other equitable relief in terms of reinstatement of unlawfully restricted HELOCs and prohibition on continuing to restrict HELOCs in violation of the TILA, Regulation Z, the UCL and in breach of the HELOC contracts.

55.   **Adequate Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the Settlement Class members, and have retained counsel competent and experienced in complex class actions.  Plaintiffs have no interests antagonistic to those of the Class and Defendant has no defenses unique to Plaintiffs.

56.   **Predominance and Superiority:** This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy.  Joinder of all members is impracticable.  The damages suffered by the individual members of the Settlement Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by the actions of Defendant.  It would be virtually impossible for the individual members of the Class to obtain effective relief from the misconduct of Defendant.  Even if members of the Class themselves could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint.  By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication,

economy of scale, and comprehensive supervision by a single Court.  Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

57.      **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Settlement Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Settlement Class as a whole.  The policies of Defendant challenged herein apply and affect members of the Settlement Class uniformly, and Plaintiffs' challenge of these policies hinges on Defendant's conduct, not on facts or law applicable only to Plaintiffs.

<u>**Count I: Violation of TILA and Regulation Z**</u>
**(on behalf of the Financial Circumstances Class and the Property Value Class)**

58.      Plaintiffs incorporate the above allegations by reference.

59.      TILA and Regulation Z prohibit Defendant from unilaterally changing any of the terms of a mortgage or HELOC, including the credit limit.  15 U.S.C. § 1647(c)(1); 12 C.F.R. § 226.5b(f)(3). There are two relevant exceptions.

***Adverse material change in the borrowers' financial circumstances***

60.      Under the first exception, a bank may restrict a HELOC if the bank reasonably believes that the HELOC holder will be unable to satisfy the HELOC terms due to a material adverse change in the borrower's financial circumstances.  This exception requires both a material change in a borrower's financial situation and the creditor's reasonable belief that the borrower will not be able to repay the HELOC account as agreed.  15 U.S.C. § 1647; 12 C.F.R. § 226.5b(f)(3)(vi), Comment 7.  Regulation Z permits Wells Fargo to restrict a HELOC account only when the designated circumstances exist, and the regulatory commentary emphasizes that credit privileges must be reinstated when those circumstances cease.

61.      Before restricting the credit limits on its borrowers' HELOCs, Defendant had the obligation to ensure both that the customers' financial circumstances had in fact adversely changed in a material sense and, if so, that such a material adverse change would reasonably render the customers unable to meet the terms of their agreements.

62.     Wells Fargo's practice of restricting HELOCs based on "derogatory credit" violates these duties.  "Derogatory credit," standing alone, does not automatically mean a customer's financial circumstances have materially changed and, without further investigation or evidence, it does not give Wells Fargo a basis for a reasonable belief that the borrower will not be able to meet the terms of his or her HELOC agreement.  On information and belief, with respect to Plaintiff Hamilton and the Financial Circumstances Class, Wells Fargo failed to reasonably investigate whether any so-called "derogatory credit" item was disputed or illegitimate, let alone an indicator of a material adverse change in financial circumstances.

63.     Furthermore, "derogatory credit" is not one of the recognized "triggering events" that permit a bank to restrict a HELOC.  As the Federal Reserve's Board Official Staff Commentary to Regulation Z (the "Commentary") provides, a creditor may not use any "'triggering events' or responses that the regulation expressly addresses in a manner different from that provided in the regulation."  12 C.F.R. § 226.5b(f)(3)(i), Comment 2.

64.     Financial Circumstances Class members have additionally been harmed because Defendant knowingly failed to disclose information that would permit Class members to fairly determine whether to seek reinstatement, including but not limited to how Defendant determines or defines an adverse material change in financial circumstances, and how Defendant computes the accountholders' ability to satisfy the terms of their HELOC agreements.

65.     Wells Fargo has additionally used threats, intimidation, and other methods to strongly discourage Plaintiff Hamilton and, upon information and belief, the other Financial Circumstances Class members from challenging Wells Fargo's decision to reduce the credit limits on their accounts.

66.     As an actual and proximate result of Defendant's above-described practices of: (a) failing to ensure reasonable grounds existed for concluding that a material adverse change in financial circumstances had occurred, or, if it had, that the material change would reasonably preclude its borrowers from meeting the terms of their HELOC agreements; (b) using "derogatory credit" as a pretext for suspending their accounts or reducing their credit limits without

1  investigating the legitimacy or facts surrounding the derogatory items or the derogatory items'

2  impact on the borrowers' financial circumstances; (c) withholding necessary information required

3  for a customer to determine whether it is worthwhile to pursue reinstatement; and (d) using strong-

4  arm tactics and threats to discourage borrowers from challenging Wells Fargo's decisions,

5  Plaintiff Hamilton and the Financial Circumstances Class members have suffered actual and

6  consequential damages in the form of being denied the use and enjoyment of and access to their

7  bargained-for credit at a crucial time, returned/dishonored check fees, finance charges, annual

8  fees, lost interest, early termination fees and other costs and damages.

9  ***Significant decline in value of the property securing the HELOC***

10      67.     Under the second relevant exception, banks may restrict a HELOC if the

11  borrower's home value declines significantly from the appraised value at the time of the HELOC's

12  origination.  15 U.S.C. § 1647(c)(2)(B); 12 C.F.R. § 226.5b(f)(3)(vi)(A).

13      68.     The Commentary defines "significant decline" for purposes of §226.5b(f)(3)(vi)(A)

14  as a decline in home value so that "the initial difference between the credit limit and the available

15  equity (based on the property's appraised value for the purposes of the plan) is reduced by fifty

16  percent."  The Commentary further states that Regulation Z "does not require a creditor to obtain

17  an appraisal before suspending credit privileges [but] a significant decline must occur before

18  suspension can occur."  On August 26, 2008, the Office of Thrift Supervision issued official

19  guidance that warned it would violate Regulation Z to "reduce the credit limits of all HELOC

20  accounts in a geographic area in which real estate values are generally declining without assessing

21  the value of the collateral that secures each affected HELOC account." *Office of Thrift*

22  *Supervision: Guidance on Home Equity Lines of Credit*, OTS 08 038 (Aug. 26, 2008).

23      69.     Wells Fargo violated TILA and Regulation Z by reducing the HELOCs of the

24  Property Value Class members in the absence of any "significant decline" in the value of the

25  subject properties.  On information and belief, the home values of the Property Value Class

26  members had not significantly declined in value.

27      70.     Rather, on information and belief, Defendant knowingly and intentionally used a

28

variety of dubious formulas and fundamentally unreliable and aged data (including information regarding the general decline of property values in broad geographic areas) to value its customers' homes in order to justify blanket restrictions on HELOC accounts.  On information and belief, the methodology used with respect to Defendant's AVM HELOC modeling is inaccurate and unsubstantiated, making its use unfair, deceptive, and readily subject to manipulation.

71.     On further information and belief, Wells Fargo and/or agents acting under Wells Fargo's direction and control, failed to, among other acts or omissions:  (a) disclose the reason for and basis behind the use of an AVM-derived property value; (b) disclose the value necessary to reinstate the HELOCs; (c) validate its AVMs on a periodic basis to mitigate against false values; (d) properly document the AVM's analysis, assumptions, and conclusions; (e) appropriately back-test representative samples of the AVMs against market data on actual sales; (f) account fairly for improvements, property type, or geographic comparables; and/or (g) take other necessary steps to reasonably verify the accuracy of the AVMs.

72.     Additionally, Wells Fargo further violated TILA and Regulation Z when it restricted HELOCs beyond the period of time when there had been a purported significant decline in property values.  For example, Plaintiff Hickman's credit line was reduced on October 14, 2008 based upon an AVM-generated valuation that was, on information and belief, conducted on May 1, 2008 – over five months earlier.  Thus, even if Hickman's property did experience a significant decline in value (which it did not), Wells Fargo lacked any reasonable factual basis to conclude that any such significant decline was still in effect during the period in which it reduced the credit limit – over five months later and beyond.  On information and belief, Wells Fargo reduced the credit limits of the Property Value Class members several months after the AVM valuations were conducted and, therefore, beyond the period when any purported "significant" decline was in effect.

73.     Defendant's failure to specifically value the property of each Property Value Class member, failure to use a reliable valuation method, and failure to reduce credit limits only during the period of a "significant decline" in property value constitute violations of TILA and

1  Regulation Z.

2      74.    Wells Fargo's violations of TILA and Regulation Z damaged Plaintiffs Hickman,

3  the Yellins, O'Leary and the Property Value Class members.  These damages occurred in the form

4  of denial of the full use of the bargained-for benefit of the HELOCs, appraisal fees, increased price

5  of credit, adverse effects on credit scores, loss of interest, and other damages.

6      75.    Plaintiffs, on behalf of the Financial Circumstances and Property Value Class

7  members, seek actual damages under 15 U.S.C. § 1640(a)(1), statutory damages under 15 U.S.C. §

8  1640(a)(2)(B), costs of the action, together with reasonable attorneys' fees under 15 U.S.C. §

9  1640(a)(3), in an amount to be determined at trial, as well as reinstatement of all HELOCs

10  suspended in violation of TILA and Regulation Z.

11  

**Count II:  Declaratory Relief Under TILA and Regulation Z**
**(on behalf of the Financial Circumstances Class and the Property Value Class)**
12  **(in the alternative to Count I)**

13      76.    Plaintiffs incorporate Paragraphs 1 through 57 as if fully set forth herein.

14      77.    Plaintiffs bring this Count in the alternative to Count I and seek declaratory relief in

15  the event this Court finds at any time that damages or other remedies under TILA, as prayed for in

16  Count I, would be inadequate to fully compensate the Financial Circumstances and/or Property

17  Value Class members or would otherwise be inadequate to fully address Wells Fargo's ongoing or

18  future violations of TILA with respect to its existing and future borrowers.

19      78.    Defendant restricted the HELOCs of the Financial Circumstances and Property

20  Value Class members in the absence of a valid triggering event by relying on improper grounds

21  and/or fundamentally flawed data to justify blanket restrictions on its customers' HELOC limits.

22      79.    Defendant's restriction of the Financial Circumstances and Property Value Class

23  members' HELOCs violated TILA and Regulation Z.

24      80.    The Financial Circumstances and Property Value Classes and Defendant have

25  adverse legal interests, and there is a substantial controversy between the Classes and Defendant

26  of sufficient immediacy and reality to warrant the issuance of a declaratory judgment as to

27  whether Defendant's mass reduction of HELOC credit limits and improper property valuation

28

1   techniques violate TILA and Regulation Z.

2       81.     In the event this Court should at any time find that damages or other remedies

3   under TILA would be inadequate to fully compensate the Financial Circumstances and/or Property

4   Value Class members, or would be inadequate to otherwise fully address Wells Fargo's ongoing

5   or future violations of TILA, the members of the Classes seek a declaratory judgment under 27

6   U.S.C. § 2201 that Wells Fargo's mass treatment of HELOCs in the absence of an adverse

7   material change in the borrowers' financial circumstances and in the absence of a significant

8   decline in the borrowers' home values violates TILA and Regulation Z.

9               **Count III: Breach of Contract**
10   **(On behalf of the Financial Circumstances Class and the Property Value Class)**

        82.     Plaintiffs incorporate the above allegations by reference.
11
        83.     The Financial Circumstances and Property Value Class members entered into
12
    HELOC agreements with Defendant Wells Fargo.  The terms of these HELOC agreements
13
    constitute a contract between Defendant and the members of the Classes.
14
        84.     The HELOC agreements contain terms that correlate with Regulation Z and
15
    provide that Defendant may reduce the credit limit or suspend additional extensions of credit
16
    during times when "there is any material change in my financial circumstances that the Bank
17
    reasonably believes will make [a borrower] unable to fulfill [his or her] repayment obligations
18
    under [the HELOC] Agreement" or when "the value of the [property securing the HELOC]
19
    declines significantly below [the property's] original appraised value." (*See* Grp. Ex. B.)
20
        85.     The Financial Circumstances and Property Value Class members made all
21
    payments due to Defendant and otherwise fully performed under their HELOC agreements with
22
    Defendant.
23
        86.     The availability of credit and the triggering events that Wells Fargo could use to
24
    restrict HELOCs were material terms of the HELOC contracts.
25
    ***Financial Circumstances Class***
26
        87.     Defendant materially breached the terms of the HELOC agreements by restricting
27
    the HELOC accounts of the Financial Circumstances Class members when no material adverse
28

1    change in financial circumstances had in fact occurred to give Defendant a reasonable basis for

2    believing that the borrowers would be unable to fulfill their payment obligations under their

3    HELOC agreements.

4    ***Property Value Class***

5        88.     Wells Fargo also materially breached its HELOC agreements by restricting the

6    HELOCs of the Property Value Class members in the absence of a significant decline in the value

7    of the properties securing their respective HELOCs.  For example, on information and belief, the

8    fair market value of the Yellins' property at the time Wells Fargo reduced their HELOC was at

9    least $610,000, and because the Yellins had partially paid down their primary mortgage balance,

10    the decline in unencumbered equity in their property was just 35.2%, with a $218,000  "equity

11    cushion" still remaining.  Even considering Wells Fargo's own flawed and incorrect AVM

12    valuation, the Yellins' home and, on information and belief, those of the Property Value Class

13    members did not significantly decline in value sufficient to justify HELOC restrictions under the

14    terms of the HELOC Agreements, especially since a Wells Fargo representative admitted that the

15    AVM valuation of $582,000 would support a $215,000 HELOC if the Yellins re-qualified for a

16    new HELOC bearing a higher interest rate.

17        89.     Also with respect to the Property Value Class members, on information and belief,

18    Wells Fargo used a new, reduced LTV standard as the primary or contributing basis by which it

19    reduced or suspended the HELOCs.  For example, a Wells Fargo representative told Mr. Yellin

20    that Wells Fargo had made its decisions to reduce credit limits or suspend HELOCs due to new

21    underwriting and LTV ratio standards and that the Yellins' LTV ratio was too high under the new

22    standard.

23        90.     The HELOC Agreements contain specific bases that permit Wells Fargo to restrict

24    HELOCS.  For example, Section 18 of the Yellins' Agreement states in relevant part as follows:

25        The Bank may suspend the use of my Account and temporarily prohibit future
          Advances during the Draw Period, or the Bank may reduce my credit limit, for
26       any reason permitted by applicable law, including without limitation (a) if the
          annualized Daily Periodic Rate equals or exceeds the Lifetime Rate Cap stated
27       herein, (b) there is any material change in my financial circumstances that the
          Bank reasonably believes will make me unable to fulfill my repayment
28

> obligations under this Agreement, (c) the value of the Property declines significantly below its original appraised value, as determined by the Bank, (d) my failure to comply with any material obligation under this Agreement or the Security Instrument, (e) a regulatory authority has notified the Bank that continued Advances would constitute an unsafe and unsound business practice, (f) I am in default under Section 17 above, or (g) government action prevents the Bank from imposing the ANNUAL PERCENTAGE RATE provided for in this Agreement or impairs the Bank's security interest in the Property, such that the value of the security interest is less than 120 percent of the credit limit.

(Ex. B, Yellins' HELOC Agreement § 18.)  The Agreement does not permit Wells Fargo to reduce the credit limit on an existing HELOC in order to conform the HELOC to new LTV ratio terms that did not exist at the time of the HELOC's origination.  Consequently, Wells Fargo's reduction of HELOC limits in order to conform to its new LTV policy constitutes a breach of the HELOC Agreement.

91.     As an actual and proximate result of Wells Fargo's breaches of contract, Plaintiffs and the Financial Circumstances and Property Value Class members suffered actual damages. These damages occurred in the form of being denied the full bargained-for use of their credit lines, appraisal fees, annual fees, early termination fees, the increased price of credit, adverse effect on their credit scores, loss of interest, and other damages.

92.     Plaintiffs and the Financial Circumstances and Property Value Class members seek actual and compensatory damages for Wells Fargo's breach of contract, as well as reinstatement of the wrongfully suspended or reduced HELOCs, plus interest, attorneys' fees, annual fees and costs in an amount to be determined at trial.

### Count IV: Breach of the Implied Covenants
### (On behalf of the Property Value Class members)

93.     Plaintiffs incorporate the above allegations by reference.

94.     The Property Value Class members obtained HELOCs from Wells Fargo under the terms of the HELOC Agreements.  The terms of these HELOC Agreements constitute a valid contract between the Class members and Wells Fargo.

95.     Implicit in the HELOC Agreements were contract provisions that prevented Wells Fargo from engaging in conduct that frustrates the Property Value Class members' rights to the benefits of the contract or that would impede the right of the Class members to enjoy the benefits

1  of their HELOCs.

2       96.     The credit limit was a material term of the Property Value Class members' HELOC

3  Agreements.  Wells Fargo breached the implied covenant of good faith and fair dealing in the

4  HELOC Agreements by reducing the credit limit for the Property Value Class members' HELOCs

5  without first having a reasonable ground for claiming there was a decline in value, thereby

6  preventing the Class members from receiving the benefits of their contracts.

7  ***Wells Fargo used outdated and inaccurate AVMs.***

8       97.     On information and belief, Wells Fargo knowingly and intentionally used a variety

9  of dubious AVMs that relied on outdated and unreasonably inaccurate formulas and unreliable

10  data to reach a predetermined result and to manipulate and lower the values of Wells Fargo's

11  HELOC customers' homes in order to falsely justify the blanket restrictions of HELOCs.  AVMs

12  also did not take into account substantial home improvements, such as those performed by the

13  Yellins prior to the restriction of their HELOC.

14       98.     Furthermore, on information and belief, Wells Fargo's valuation methodology was

15  flawed because Wells Fargo and/or or agents acting under its direction and control failed to:  (1)

16  validate their AVMs on a periodic basis to mitigate the potential valuation uncertainty; (2)

17  properly document the valuation's analysis, assumptions, and conclusions; (3) appropriately back-

18  test representative samples of the valuations against market data on actual sales; (4) account fairly

19  for improvements, property type or geographic comparables; and/or (5) take other necessary steps

20  to reasonably verify the accuracy of the valuations.

21  ***Wells Fargo does not have the original values as of the time of HELOC originations.***

22       99.     On information and belief, prior to reducing or suspending the HELOCs, Wells

23  Fargo did not take into account the Property Value Class members' home values as of the time of

24  the HELOC origination or when credit limits were last increased.  Wells Fargo's customer service

25  representatives told Mr. Yellin that Wells Fargo only keeps such information for 90 days and does

26  not generally keep such information in the customer's file.

27       100.     Home values as of the time of origination are necessary to determine whether there

28  

Consolidated Amended Class Action Complaint      24
Case No. 09-cv-4152

1   has been a substantial decline in value so as to trigger Wells Fargo's right to reduce the HELOCs.

2   Accordingly, Wells Fargo could not reasonably claim that the Property Value Class members'

3   homes had decreased in value since Wells Fargo had no initial values to compare with the new

4   values.

5   ***Wells Fargo fails to account for principal reductions in the borrowers' primary mortgages.***

6        101.    Even when Wells Fargo is the Property Value Class members' primary (first)

7   mortgage lender, Wells Fargo fails or refuses to take the balance of Class members' first mortgage

8   into consideration prior to reducing their HELOCs.  When Class members' pay down their first

9   mortgage balance, there is additional equity available in their homes.  By failing or refusing to

10  even consider these principal reductions, Wells Fargo could not have properly evaluated the

11  available equity in the Class members' homes.  Hence, Wells Fargo did not have a reasonable

12  ground for reducing the Class members' HELOCs.

13  ***Wells Fargo requires the submission of financial documents as a prerequisite to challenging the account treatment.***

14       102.    Wells Fargo HELOC Agreements state in relevant part that in order to reinstate a

15  suspended HELOC or increase the credit limit, the account holder must submit "satisfactory

16  evidence to the Bank that the reason(s) for suspension or reduction of [the] Account no longer

17  exist(s)."  (*See, e.g.,* Ex. B, § 18 of the Yellins' HELOC Agreement.)

18       103.    Wells Fargo breached the Agreements by requiring the Property Value Class

19  members to submit financial records as a prerequisite for challenging Wells Fargo's HELOC

20  reductions when Wells Fargo restricted the HELOC based upon a purported "substantial decline in

21  the value of the property securing the Account."  Although financial records may be part of

22  "satisfactory evidence" when Wells Fargo's stated reason for the account restriction was an

23  adverse change in the borrower's financial circumstances, borrowers' financial documents do not

24  constitute evidence that could demonstrate that the Class members' property values had not

25  significantly declined.

26  ***Wells Fargo takes steps to discourage borrowers from appealing the HELOC restrictions.***

27       104.    Wells Fargo further breached the implied covenant of good faith and fair dealing by

28  denying its customers information necessary to determine whether to appeal Wells Fargo's

account suspensions.  As alleged herein, Wells Fargo's form letter, customer service representations, and "appeals process" lack necessary details and information, thus shifting onto borrowers the burden of appealing Wells Fargo's flawed decisions while depriving borrowers of critical information needed to determine whether to seek reinstatement, including: 1) the value of the property at the time of the HELOC origination, 2) the actual present value of the property as determined by Wells Fargo's AVM, 3) how Wells Fargo calculated or determined the "significance" of any decline in value, and 4) the value that any subsequent appraisal would need to show in order for the account to be reinstated.  Wells Fargo also routinely concealed or falsely claimed that it is unable to disclose both the method and/or the standards used to determine the relevant values, as well as the values themselves.  On information and belief, Wells Fargo intentionally withheld such information in an effort to discourage borrowers from appealing its reductions and suspensions.

105.    As an actual and proximate result of Wells Fargo's breaches of the implied covenant of good faith and fair dealing, Plaintiffs Hickman, the Yellins, O'Leary and the Property Value Class members suffered actual damages.  These damages occurred in the form of being denied the full bargained-for use of their credit lines, appraisal fees, annual fees, early termination fees, the increased cost of credit, adverse effects on the credit scores, loss of interest, and other damages.

106.    Plaintiffs and the Property Value Class members seek actual and compensatory damages for Wells Fargo's breach of the implied covenants, as well as reinstatement of the wrongfully reduced or suspended HELOCs, plus interest, attorneys' fees, and costs in an amount to be determined at trial.

### Count V: Violation of the Illinois Consumer Fraud Act (815 ILCS 505/2 et. seq.)
**(On behalf of Hickman and the Property Value Class members)**

107.    Plaintiffs incorporate the above allegations by reference.

108.    Defendant's wrongful acts, as set forth throughout this Complaint, constitute unfair business practices and unfair methods of conduct and competition with the intent that consumers will rely on the unfair practices and conduct in violation of the Illinois Consumer Fraud and

1  Deceptive Business Practices Act. 815 ILCS 505/2 et. seq. ("ICFA").

2      109.    Defendant's unfair and unlawful acts occurred in commerce and caused serious and

3  irreparable injury to the Property Value Class members, and unless restrained by this Court will

4  continue to cause further injury.

5      110.    Wells Fargo's conduct was unfair because the AVMs it used to determine the

6  values of the Class members' properties were, on information and belief, inaccurate and

7  unsubstantiated so as to make their use unfair and readily subject to manipulation.  On information

8  and belief, Wells Fargo intentionally used faulty and unreliable AVMs to under-value its

9  customer's properties and provide false justification for reducing credit limits.  These unfair,

10  immoral and unscrupulous acts and practices constitute unfair business practices in violation of the

11  ICFA.

12      111.    As a direct and proximate result of the unfair, unscrupulous and unconscionable

13  practices of Defendant as set forth above, Plaintiff Hickman and the Property Value Class

14  members are entitled to actual and compensatory damages, penalties, attorneys' fees, and costs as

15  set forth in §10(a) of the ICFA, 815 ILCS 505/10(a), in an amount to be determined at trial.

16      **Count VI: Violation of the Illinois Consumer Fraud Act (815 ILCS 505/2 et. seq.)**
        **(On behalf of Hickman and the Property Value Class members)**

17
18      112.    Plaintiffs incorporate the above allegations by reference.

19      113.    Defendant's wrongful acts, as set forth throughout this Complaint, constitute

20  deceptive business practices, misrepresentation, concealment, suppression or omission of material

21  facts with the intent that consumers will rely on the concealment, suppression or omission of the

22  material facts in violation of the ICFA.  815 ILCS 505/2 et. seq.

23      114.    Defendant's unlawful acts have occurred in commerce and have caused serious and

24  irreparable injury to the Property Value Class members, and unless restrained by this Court will

25  continue to cause further injury.

26      115.    Wells Fargo made a false statement of material fact in its Notice of HELOC

27  Reduction letters that it sent to the Property Value Class members. (*See* Grp. Ex. A.)  For

28  example, in the October 14, 2008 letter to Plaintiff Hickman, Defendant represented that

1   Hickman's property that secured his HELOC had substantially declined in value.  (Grp. Ex. A.)

2   This representation was false because Hickman's property had not, in fact, significantly declined

3   in value.  On information and belief, Wells Fargo knew or should have known at the time of

4   making this representation that such a representation was false, that Wells Fargo's AVMs were

5   inaccurate, that Hickman's property had not significantly declined in value, and that Wells Fargo

6   lacked a sound factual basis for concluding otherwise.  Additionally, with respect to Plaintiff

7   Hickman, Wells Fargo knew that the AVM valuation on which it based the account reduction was

8   obtained over five months earlier and, thus, that it did not have a sound factual basis for

9   representing that Hickman's property had significantly declined in value as of the date of the

10  HELOC restriction.

11         116.    Nevertheless, on information and belief, Wells Fargo intentionally misrepresented

12  that property values had declined so as to falsely trigger its right to restrict the Property Value

13  Class members' HELOCs.

14         117.    Wells Fargo intended that its customers rely on its misrepresentations and knew

15  that such misrepresentations were likely to deceive reasonable HELOC borrowers into believing

16  that their home values had significantly declined, which in turn was likely to prevent or limit

17  appeals from customers whose accounts were restricted.

18         118.    In reliance on Wells Fargo's misrepresentation that their home values significantly

19  declined, Plaintiff Hickman and, on information and belief, other Property Value Class members

20  forewent appealing Wells Fargo's decision to reduce their HELOCs and thus incurred significant

21  damages, including the lost use of the bargained-for credit line.

22         119.    As a direct and proximate result of Wells Fargo's deceptive, unscrupulous and

23  unconscionable practices, Plaintiff Hickman and the Property Value Class members are entitled to

24  actual and compensatory damages, penalties, attorneys' fees, and costs as set forth in §10(a) of the

25  ICFA, 815 ILCS 505/10(a), in an amount to be determined at trial.

26                    **Count VII: Violation of California's Unfair Competition Law**
                              **(Cal. Bus. & Prof. Code § 1700)**
27            **(On behalf of the Yellins, O'Leary and the Property Value Class members)**

28

1    120.    Plaintiffs incorporate the above allegations by reference.

2    121.    Wells Fargo's wrongful acts as alleged throughout this complaint constitute, and

3  were premised on, unfair and fraudulent conduct by Wells Fargo in violation of California's

4  Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 1700.

5    122.    Wells Fargo's conduct was deceptive and unfair because the AVMs it used to

6  determine the values of the Property Value Class members' properties were, on information and

7  belief, inaccurate and unsubstantiated so as to make their use unfair, deceptive and readily subject

8  to manipulation.  Furthermore, Wells Fargo unfairly restricted HELOCs when significant declines

9  in property value had not occurred and when Wells Fargo lacked a sound factual basis to conclude

10 otherwise.  These deceptive, unfair, and fraudulent acts and practices constitute unfair competition

11 in violation of the UCL. (Cal. Bus. & Prof. Code § 1700)

12 ***Wells Fargo's conduct violates the "Unfair" prong of the UCL.***

13   123.    Wells Fargo violated the "unfair" prong of the UCL because Wells Fargo restricted

14 HELOCs in the absence of a significant decline in the value of the properties securing the

15 HELOCs and despite the fact that Wells Fargo lacked a reasonable basis for concluding that

16 property values had declined.  Wells Fargo used AVMs that were inaccurate and unsubstantiated

17 so as to make their use, and the HELOC restrictions premised on the AVM values, unfair.

18   124.    Wells Fargo's actions were further unfair in that Wells Fargo restricted HELOCs

19 without taking into consideration the amount of available equity in the underlying property,

20 including the balance of any primary mortgage.  This occurred despite the fact that the level of

21 available equity is, or should be, Wells Fargo's primary consideration in deciding whether to

22 restrict a HELOC.  Additionally, Wells Fargo unfairly made determinations as to a "decline" in

23 property value without both determining and considering property value when the HELOC was

24 originated.

25   125.    Wel1s Fargo further violated the "unfair" prong of the UCL by claiming that it

26 based its HELOC restriction decisions on its new LTV ratio policy.  A unilateral change in the

27 LTV policy is not a legitimate ground to justify HELOC restrictions.  Thus, in addition to basing

28

1    its decisions on an inappropriate factor, Wells Fargo unfairly implemented a new "policy" that was

2    not in place when the HELOC Agreements were executed.

3         126.    As in Plaintiffs Yellins' case, Wells Fargo further violated the "unfair" prong of the

4    UCL by representing that the AVM-derived property value was sufficient to support a new

5    HELOC with the original credit limit, but only if Plaintiffs submitted new financial statements and

6    re-qualified for the new HELOC.  This further demonstrates that the HELOC restrictions were

7    nothing more than unfair and unscrupulous pretext for Wells Fargo's actions.

8         127.    Wells Fargo's conduct was further unfair because Wells Fargo denied the Property

9    Value Class members access to information necessary to determine whether to appeal Wells

10   Fargo's restriction of the HELOC accounts.  Wells Fargo's form letter, customer service

11   representations, and "appeals process" lack necessary details and information, shifting onto

12   borrowers the burden of appealing Wells Fargo's flawed decisions while depriving them of critical

13   information needed to determine whether to seek reinstatement in the first place.  Necessary

14   information includes: the value of the property at the time of the HELOC origination, the actual

15   present value of the property as determined by Wells Fargo's AVM, how Wells Fargo calculated

16   or determined the "significance" of any decline in value, and what value a subsequent appraisal

17   would need to show in order for the account to be reinstated.

18        128.    Wells Fargo also routinely concealed or falsely claimed it was unable to disclose

19   both the method and/or the standards used to determine the relevant AVM values, as well as the

20   values themselves.  On information and belief, Wells Fargo intentionally withheld such

21   information in an effort to discourage borrowers from appealing the HELOC restrictions.

22        129.    Wells Fargo further violated the "unfair" and "fraudulent" prong of the UCL when

23   it demanded that Property Value Class members submit financial information prior to being

24   allowed to challenge the HELOC restrictions, despite the fact that the restriction was based solely

25   on property value.  Requiring that borrowers submit financial information, even though the

26   adverse action was based on unrelated grounds, is unfair and further demonstrates Wells Fargo's

27   unscrupulous pretext for the HELOC restrictions.

28

Consolidated Amended Class Action Complaint          30
Case No. 09-cv-4152

130.    Wells Fargo's actions caused substantial injury to the Yellins, O'Leary, and the Property Value Class members, which is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that Class members themselves could not reasonably have avoided.

***Wells Fargo's conduct violates the "Fraudulent" prong of the UCL.***

131.    Wells Fargo violated the "fraudulent" prong of the UCL because Wells Fargo's statements regarding the availability of credit through the HELOCs were false and were likely to deceive a reasonable consumer.

132.    For example, Wells Fargo made a false statement of material fact in the notice letter it sent to Plaintiffs Yellins on October 29, 2008.  (*See* Grp. Ex. A.)  In that letter, Wells Fargo falsely represented that the Yellin's property that secured the HELOC had substantially declined in value.  On information and belief, similar letters with false representations have been sent to other members of the Property Value Class.

133.    Wells Fargo knew or should have known at the time of making this representation that such a representation was false, that Wells Fargo's AVMs were inaccurate, that the Property Value Class members' properties had not significantly declined in value, and that Wells Fargo lacked a sound factual basis for concluding that the values had significantly declined, especially since Wells Fargo did not account for reductions in the first mortgage balance and did not, on information and belief, compare any newly computed property values with the original value as of the time of HELOC origination.

134.    Wells Fargo knew or should have known that it lacked a sound factual basis for restricting HELOCs because, on information and belief, it based its restriction decisions on a new LTV policy, rather than compare the AVM values with the property value as of the time of HELOC origination.  Wells Fargo's representations that the HELOC restriction decision was premised on a decrease in property value were therefore fraudulent and intentionally misleading because the decisions were actually based on a change in the LTV policy.

135.    On information and belief, Wells Fargo intentionally made such false

representations in its notice letters in an effort to justify its right to restrict the Property Value Class members' HELOCs.  Wells Fargo knew and intended that its customers would rely on its misrepresentations, and that such misrepresentations were likely to deceive reasonable HELOC borrowers into believing that their home had in fact significantly declines in value, which would in turn prevent or limit such customers from appealing the restrictions.  Indeed, on information and belief, in reliance on Wells Fargo's misrepresentations regarding home values, many Class members forewent the appeals process and thus incurred significant damages, including the lost use of the bargained-for credit line.

136.    Wells Fargo's violations of the UCL caused the Yellins, O'Leary, and Property Value Class members damages in the form of fees, lost interest, lost of use of the bargained-for credit line, lost opportunity, harm to credit scores, and increased cost of credit, as well as attorneys' fees and other damages.

137.    The Yellins, O'Leary, and Property Value Class members, seek an order preliminarily and permanently enjoining Wells Fargo's unfair competition as alleged herein, requiring Wells Fargo to restore the Property Value Class members' restricted HELOC, and providing individual restitution of property gained by Wells Fargo's unfair competition under the UCL (Cal. Bus. & Prof. Code § 17203), as well as interest and attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

## Count VIII: Breach of Contract, or in the alternative, Unjust Enrichment
### (On behalf of the Former Customer Class)

138.    Plaintiffs incorporate the above allegations by reference.

139.    Former Customer Class members entered into HELOC agreements with Wells Fargo.  The terms of these HELOC agreements constitute a contract between the Class members and Wells Fargo.

140.    The HELOC agreements contain terms that correlate with Regulation Z and provide that Defendant may reduce the credit limit or suspend additional extensions of credit during times when "there is any material change in my financial circumstances that the Bank reasonably believes will make [a borrower] unable to fulfill [his or her] repayment obligations

1   under [the HELOC] Agreement" or when "the value of the [property securing the HELOC]

2   declines significantly below [the property's] original appraised value."  (*See* Grp. Ex. B.)

3       141.    Former Customer Class members made all payments due to Wells Fargo and

4   otherwise fully performed under their HELOC agreements.

5       142.    The availability of credit and the triggering events that Wells Fargo could use to

6   restrict HELOCs were material terms of the HELOC contracts.

7       143.    Wells Fargo materially breached the terms of the HELOC agreements by

8   suspending the HELOC accounts when borrowers had not experienced a material adverse change

9   in financial circumstances and in the absence of a significant decline in the value of the properties

10  securing their respective HELOCs, despite Wells Fargo's representations that such triggering

11  events had in fact occurred.

12      144.    As an actual and proximate result of Wells Fargo's breaches of contract, Former

13  Customer Class members suffered actual damages in the form of being denied the full bargained-

14  for use of their credit lines, deferred origination fees, and costs associated with obtaining

15  alternative financing, including appraisal costs and origination fees for replacement HELOCs.

16  Former Customer Class members seek actual and compensatory damages for Wells Fargo's breach

17  of contract.

18      145.    In the alternative, in the event this Court finds no contractual provisions expressly

19  govern the issues raised herein, Wells Fargo has knowingly received and retained benefits from

20  the Former Customer Class members under circumstances that would render it unjust to allow

21  Wells Fargo to retain such benefits.

22      146.    By unlawfully restricting the HELOCs, Wells Fargo gained early termination fees

23  from Former Customer Class members who were forced to seek alternative HELOCs.

24      147.    Former Customer Class members seek restitution and disgorgement of all revenues

25  gained at the Former Customer Class members' expense, through Wells Fargo's wrongful acts, as

26  well as interest and attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

27

28

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment and orders in their favor and against Defendant as follows:

(a)     Certifying the action as a class action and designating Plaintiffs and their counsel as representatives of the Settlement Class;

(b)     Entering declaratory judgment under 27 U.S.C. § 2201 on Count III that Defendant's HELOC practices violate federal law;

(c)     Awarding statutory damages under 15 U.S.C. § 1640(a)(2)(B) on Count I;

(d)     Awarding actual and consequential damages to Plaintiffs and the Settlement Class including but not limited to damages to compensate Plaintiffs and Settlement Class for loss of the use and enjoyment of and access to their bargained-for credit lines, returned/dishonored check fees, finance charges, increased cost of credit, annual fees, lost interest, early termination fess, deferred origination fees and other costs and damages;

(e)     Ordering reinstatement of all HELOCs that were reduced or suspended based on improper triggering events and/or false claims that the borrowers' financial circumstances had experienced any material adverse change or the home value had declined significantly;

(f)     Awarding restitution of property gained by the unfair competition alleged herein and an order for accounting of such property;

(f)     Awarding pre- and post-judgment interest, costs and reasonable attorneys' fees; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: January 25, 2012                    Respectfully submitted,

                                           MARIKA HAMILTON, MICHAEL HICKMAN,
                                           JEFFREY AND ELLEN YELLIN, and BRENDAN
                                           O'LEARY individually and on behalf of a class of
                                           similarly situated individuals

1

2

By: /s/ Sean Reis
          One of Plaintiffs' Attorneys

3

4

5

6

Sean Reis (SBN 184044)
EDELSON MCGUIRE, LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, CA 92688
949-459-2124 (phone)
949-459-2123 (fax)
sreis@edelson.com

7

8

9

10

11

12

Jay Edelson (admitted *pro hac vice*)
Steven Woodrow (admitted *pro hac vice*)
Evan Meyers (admitted *pro hac vice*)
EDELSON MCGUIRE, LLC
350 N. LaSalle Drive, Suite 1300
Chicago, IL 60654
312-589-6373 (phone)
312-589-6378 (fax)
jedelson@edelson.com
swoodrow@edelson.com
emeyers@edelson.com

13

14

15

16

17

18

David C. Parisi (SBN 162248)
Suzanne Havens Beckman (SBN 188814)
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
818-990-1299 (phone)
Fax: 818-501-7852 (fax)
dcparisi@parisihavens.com
shavens@parisihavens.com

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2

   I, Sean P. Reis, hereby certify that on January 25, 2012, I electronically filed the foregoing

3

*Consolidated Amended Class Action Complaint and Jury Demand* with the Clerk of the Court

4

using the CM/ECF system. Notice of this filing is sent to all counsel of record by operation of the

5

Court's electronic filing system.

6

7

                            /s/ Sean P. Reis
8                            Sean P. Reis

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28